927 A.2d 69

**Rahmat Mitchell PETTIGREW**

v.

**STATE of Maryland.**

**No. 154, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

July 3, 2007.

Eric K. Chiu (William & Connolly, on the brief), Washington (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Carrie J. Williams (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: DAVIS, DEBORAH S. EYLER and THEODORE G. BLOOM, (retired, specially assigned), JJ.

**298**

DAVIS, J.

Appellant, Rahmat M. Pettigrew, was tried and convicted by a jury in the Circuit Court for Baltimore County (Cavanaugh, J.) of one count of first-degree assault, two counts of second-degree assault, one count of reckless endangerment and one count of malicious destruction of property. He was sentenced to twenty years imprisonment for the first-degree assault charge, three years imprisonment for each of the second-degree assault charges, two years for reckless endangerment and six months for the malicious destruction of property, both of the latter two charges to run concurrently to the sentence for first-degree assault. In this appeal, appellant presents the following questions for our review: [1]

    I.    Was the evidence insufficient to support appellant's conviction of assault in the first-degree, employing the doctrine of transferred intent?

    II.   Did the trial court err by instructing the jury on the doctrine of transferred intent?

    III.  Did the trial court err by not merging appellant's convictions of first-degree assault and reckless endangerment for the purpose of sentencing?

We answer questions I and II in the affirmative and, accordingly, reverse the judgment of conviction for first-degree assault. Perceiving that the conviction for reckless endangerment was unaffected by errors relating to the conviction for first-degree assault, we affirm the conviction and sentence for reckless endangerment.

---

1. Appellant's questions, as stated in his brief, are as follows:
    1.  Is the evidence insufficient to support a conviction of first-degree assault where [appellant] threw glassware at one person, did not physically injure that person, but broken glass hit another person in an adjacent room causing injury?
    2.  Did the trial court err in instructing the jury on the doctrine of transferred intent?
    3.  Did the trial court err in imposing separate sentences for first degree assault and reckless endangerment?

## FACTUAL BACKGROUND

On the afternoon of June 15, 2005, appellant entered an Applebee's restaurant in Baltimore County. His friend and co-worker, Jeffrey Stewart, was drinking at the bar located in the middle of the restaurant. Appellant sat next to Stewart and began discussing a disagreement that they had had at work. After a few minutes, the conversation grew heated and Stewart "made a gun gesture" [2] at appellant's head.

Jeremy Davis, the manager of the restaurant, then attempted to intervene. Both men continued shouting obscenities and threatening each other. Stewart "started rushing" and a punch was thrown. Davis testified that appellant threw the punch, which struck Stewart in the face and caused both Davis and Stewart to fall backwards. Appellant then picked up a heavy wooden bar stool and threw it in Davis' and Stewart's direction, striking Davis in the back. The brawl continued with appellant and Stewart tackling each other and falling to the ground.

As others in the restaurant attempted to halt the altercation, Stewart hid at the far end of the bar located near the entryway to the kitchen. Appellant began to hurl glassware from nearby tables at Stewart. Struck by a glass pepper shaker, Davis indicated that Stewart cowered behind him in an effort to avoid the projectiles.

Stewart next ran to the side of the horseshoe-shaped bar closest to the front of the restaurant. Davis testified that appellant "began to pick up anything that he could get his hands on, ashtrays, shot glasses, beer mugs, and began to throw them in the direction of the entrance to the kitchen," which shattered "on a light shade and on the wall."

Thomas McNiel, an Applebee's employee, stated that appellant was approximately ten feet away from the entrance to the kitchen as he threw the glass. McNiel testified that he was able to pull some of the glasses and things out of appellant's

---

2. He ostensibly mimicked shooting appellant in the head.

reach; however, appellant grabbed three or four "bar tumbler" glasses, among other things, and threw them in Stewart's direction. McNiel further testified that appellant was "extremely angry . . . irate," and ignored demands to leave the restaurant.

Sara Juarez, a twenty-three year old cook, and Todd Kuyawa, a plumber hired to fix a leak, were both in the kitchen as the commotion in the bar area occurred. Juarez, five months pregnant on the date of the incident, walked out only a step in front of Kuyawa to investigate the disturbance. Kuyawa described the scene in the dining room as "mayhem."

One of the glassware items thrown by appellant hit the wall, shattering into several pieces, approximately eight feet from where Juarez and Kuyawa were located. Shards of glass hit Juarez and she sustained cuts to her face, lower lip and eye. Kuyawa testified that all he could hear was Juarez screaming and he witnessed blood "just gushing all over the place."

Davis stated that he found Juarez in the kitchen "screaming extremely loud" and with the blood "gushing very fast and very hard out of her eye, out of her mouth, out of her cheek." He witnessed glass actually protruding from her eye, which "appeared to be severed right down the middle." Juarez testified that the glass cut her left eye "in half," and also cut her lip, the top of her nose under her eye, and the top of her right eyelid. Juarez lost all vision in her left eye, and it eventually had to be removed to prevent infection. Kuyawa was also struck by flying glass, receiving a "very deep" cut on his arm that required stitches.

Undeterred by the severity of Juarez's injury, appellant and Stewart continued to fight. Mall security attempted to pull the two men apart, finally separating them before the police arrived. The police, upon their arrival, observed Stewart pacing back and forth while appellant sat at the bar. Although appellant's shirt had been torn off and he had sustained a cut to his hand that was bleeding, Stewart had not suffered any visible injuries. Both men were arrested. Appellant was charged with first-degree assault and reckless

endangerment as to Juarez, two counts of second-degree assault as to Kuyawa and Davis and malicious destruction of property. Appellant was not charged with second-degree assault as to Juarez, nor was he charged as to Stewart.

Arguing that the doctrine of transferred intent does not apply, appellant moved for judgment of acquittal at the end of the State's case and renewed the motion at the end of the entire case. The court denied appellant's motion for judgment of acquittal at the close of the State's case and at the conclusion of all of the evidence.

The State argued, in opposition to the defense's motion for judgment of acquittal, that the jury could find appellant guilty of first-degree assault by ascribing whatever intent appellant had directed at Stewart and transferring it to Juarez.

So in effect, the Defense is arguing that the Defendant should be rewarded because his aim was bad. He certainly meant to do that to Jeffrey Stewart. He did it to Sara Juarez as opposed to Jeffrey Stewart. And the Defendant should not be given the benefit of not having that doctrine of transferred intent apply in this case, and this is specifically, this is the prototypical, I would say, for a case for applying a transferred intent doctrine.

The purpose of the doctrine is basically to bridge two halves of a crime together. When you have a *mens rea* directed toward one victim and an *actus reus* that is carried out on a second victim, the transferred intent doctrine bridges the two together so you have a completed crime. And in this case, the Defendant intended to bring about a serious debilitating injury to Jeffrey Stewart. That very same injury occurred to Sara Juarez. *Therefore, the State's arguing that the transferred intent should apply.*

Now, [defense counsel] has cited a bunch of cases, specifically the *Harrison* case, that really does go into the detailed discussion about transferred intent. And those cases discuss situations in which the defendants are charged with incoherent [sic] crimes, such as attempted murder. And that case talks about the fact that you can't really apply a

transferred intent to an attempted murder charge to an unintended victim. In other words, it doesn't make sense to charge a defendant with attempting to murder someone who was unintended. That specific intent cannot apply to two different victims. So therefore, that incoherent [sic] defense does not apply to the transferred intent doctrine. *But in this case, we are not talking about incoherent [sic] defense, we're talking about a victim that suffered an injury of that very type that the Defendant intended upon his intended victim.* (Emphasis added).

During his closing argument to the jury, the assistant State's attorney resented his theory in support of the charge of first-degree assault:

Now, the judge has instructed you on the doctrine of transferred intent. The State believes that the Defendant in this case, and believes that the evidence will show, that the Defendant in this case intended to commit a serious bodily injury upon Jeffrey Stewart, the man he was fighting, the man in the black shirt, and all the evidence that you've heard from all the witnesses supports that conclusion. Let's go through all the evidence that shows that the Defendant was trying to inflict a serious physical injury on Jeffrey Stewart.

\* \* \*

Under the doctrine of transferred intent, it makes sense. The doctrine makes sense. And the reason is, the purpose of that doctrine is, so that people who have formed a criminal intent and have taken action to bring that criminal intent into fruition, they should not benefit from having bad aim or just being unlucky. In this case, the Defendant was trying to bring about a criminal result to Jeffrey Stewart, and he just had bad aim. He should not get the benefit of having bad aim. He should be responsible because someone in fact did end up with a serious physical injury, and that's Sara Juarez–Allender. And somebody should be responsible for that injury, and that is the man who sits across this

courtroom from you today, the [appellant]. (Emphasis added).

As noted, the jury found appellant guilty of first-degree assault against Juarez, reckless endangerment against Juarez, second-degree assault against Kuyawa and Davis and malicious destruction of property. At the sentencing hearing, appellant moved for a new trial, based again, in part, on the inapplicability of the doctrine of transferred intent. That motion was also denied.

In consideration of the severity of Juarez's injuries, the court sentenced appellant to twenty years' imprisonment for first-degree assault. The court also imposed a two year concurrent sentence for reckless endangerment of Juarez. A one year concurrent sentence for malicious destruction of property and two consecutive sentences of three years' imprisonment for each second-degree assault conviction were also imposed. Additional facts will be set forth as warranted.

## LEGAL ANALYSIS

### I and II

### SUFFICIENCY OF THE EVIDENCE and JURY INSTRUCTION

■ Appellant initially contends that the evidence was insufficient to sustain his conviction for first-degree assault because the trial court erroneously allowed the jury to apply the instruction to which appellant takes exception:

There exists under the law of Maryland the doctrine of transferred intent. Transferred intent means that whatever state of mind the Defendant entertains as to his intended target will carry over to any other victim, even if that victim is an unintended target. If you find that the Defendant's state of mind towards Jeffery Stewart was willful and deliberate, then his intent can be said to carry over to Sara Juarez, notwithstanding that she may have been an unin-

tended victim. The doctrine of transferred intent does not apply to the crime of assault with intent to disable.

Generally, if there are evidentiary facts sufficiently supporting the inference made by the trial court, the appellate court defers to the fact-finder instead of examining the record for additional facts upon which a conflicting inference could have been made, and then conducting its own weighing of the conflicting inferences to resolve independently any conflicts it perceives to exist. The resolving of the conflicting evidentiary inferences is for the fact-finder.

*State v. Smith,* 374 Md. 527, 547–48, 823 A.2d 664 (2003).

Three principles must be adhered to in our analysis:

(1) we must give great deference to the trier of facts' opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence,

(2) circumstantial evidence alone can provide a sufficient basis upon which a trier of fact can rest its determination of guilt, even for first degree murder, and

(3) we do not re-weigh the evidence or substitute our own judgment, but only determine whether the verdict was supported by sufficient evidence to convince the trier of fact of the defendant's guilt beyond a reasonable doubt.

*Pinkney v. State,* 151 Md.App. 311, 329, 827 A.2d 124 (2003).

In denying the appellant's motion for judgment of acquittal, the trial court analyzed the incident from which this appeal emanates as follows:

Parties are involved in a fray in a bar. It seems like the only innocent people in this case are the victims. Miss Juarez has lost an eye. She's scarred, probably for life, with that disfigurement there.

In the *Harrison* case,[3] this is a case where it's an attempted second degree murder. Going to a basketball court, they start firing shots at somebody they thought was a drug dealer. The person that was killed was nowhere in

---

**3.**  *Harrison v. State,* 382 Md. 477, 855 A.2d 1220 (2004).

the vicinity or the zone of harm, as they referred to it. *Transferred intent didn't apply there.* This is not an attempted second degree murder case. It's a first degree assault charge.

They refer to the zone of harm. Clearly in Applebee's there was a zone of harm created by [appellant's] actions. He threw the bar stools. They didn't go far enough. He started throwing the glass. Instead of going in her eye, it just as easily could have cut her carotid artery. It could have killed her.

I don't think that the *Harrison* case is on point. It's not a first degree assault case. I don't think the *Ford*[4] case is on point. Likewise, that's not a first degree assault case. He intended to commit serious bodily harm based upon the testimony that I've heard at this point. (Emphasis added).

Assault is defined in § 3–201(b) of the Criminal Law Article as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." Section 3–202(a)(1) delineates assault in the first degree: "A person may not intentionally cause or attempt to cause serious physical injury to another." Serious physical injury is defined as

(1) creates a substantial risk of death; or

(2) causes permanent or protracted serious:

(i) disfigurement;

(ii) loss of the function of any bodily member or organ; or

(iii) impairment of the function of any bodily member or organ.

Md.Code Ann., Criminal Law § 3–201(d) (2007).

In *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974), the Court of Appeals considered Gladden's contention that he could not be convicted of murder when his intent was to kill his drug supplier, but, missing his target, he killed a twelve-

---

4. *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993), *superseded by statute, Robinson v. State,* 353 Md. 683, 728 A.2d 698 (1999).

year-old boy sitting in his living room. In affirming this Court's decision, the Court expressly adopted the doctrine of transferred intent, stating that "the doctrine of 'transferred intent' is the law of Maryland and that the *mens rea* of a defendant as to his intended victim will carry over and affix his culpability when such criminal conduct causes the death of an unintended victim." *Id.* at 405, 330 A.2d 176.

The doctrine was later applied in *Ford, supra.* In that case, Ford and three other young boys threw large landscaping rocks at vehicles traveling on the Baltimore Beltway. Several people in those vehicles were injured and significant damage was done to many vehicles. Ford was convicted by a jury of one count of assault with intent to maim, eleven counts of assault with intent to disable, seventeen counts of assault and battery, six counts of assault and seventeen counts of malicious destruction of property. *Id.* at 689, 625 A.2d 984. In his appeal to this Court, all but two of the convictions for malicious destruction of property were affirmed. *See Ford v. State,* 90 Md.App. 673, 603 A.2d 883 (1992).

In *dictum,* the Court of Appeals addressed the applicability of the doctrine of transferred intent as it related to the charge of assault with intent to disable and related crimes. The Court commented that

[t]he underlying rationale for the doctrine also suggests that transferred intent should apply only when, without the doctrine, the defendant could not be convicted of the crime at issue because the mental and physical elements do not concur as to either the intended or the actual victim. As Dean Prosser notes, "[t]he early criminal cases were understandably preoccupied with *mens rea,* moral guilt, and the obvious fact that if the defendant was not convicted there would be no one to punish for the crime." Thus, transferred intent makes a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim. Transferred intent does *not* make two crimes out of one. Where the crime intended has actually been committed against the intended victim, transferred

intent is unnecessary and should not be applied to acts against unintended victims.

*Ford,* 330 Md. at 711–12, 625 A.2d 984 (citations and footnote omitted).

The Court continued:

Transferred intent is equally inapplicable to other circumstances where the subject crime is already completed as to an intended victim, such as attempts or other crimes that can be completed without the necessity of physical contact. Such crimes have one thing in common-where the "bullet" ends up is superfluous to the crime, so there is no need for the intent to "follow the bullet" to link the crime's mental and physical elements. The crime at issue here, assault with intent to disable, is such a crime. Because the elements of an assault with intent to disable are (1) an assault and (2) an intent to disable, the crime is complete regardless of whether the projectile reaches its target. The requisite intent has already been formed and the requisite assault has already been committed; no intent need be transferred to complete a crime.

*Id.* at 713, 625 A.2d 984.

The *dictum* in *Ford* was adopted in *Poe v. State,* 341 Md. 523, 671 A.2d 501 (1996). In that case, Poe intended to kill his estranged wife by shooting her, but instead the bullet traveled through his wife's arm and killed the daughter of his wife's boyfriend. At the close of evidence, the court instructed the jury on the theory of transferred intent as it applied to the killing of the boyfriend's daughter. *Id.* at 527, 671 A.2d 501. Poe was convicted of murder of the daughter and attempted murder of his wife.[5] On appeal, he claimed that the doctrine of transferred intent was inapplicable because he depleted all of his intent when he successfully shot his intended victim. *Id.* at 528, 671 A.2d 501. In rejecting Poe's contention, the Court held:

---

5. Poe received a life sentence without the possibility of parole for the murder conviction and thirty years (to be served consecutively) for the attempted murder conviction.

In *Ford,* we made clear that *if* a defendant intends to kill a specific victim and instead wounds an unintended victim without killing either, the defendant can be convicted only of the attempted murder of the intended victim and transferred intent does not apply. This is not true where, as is the case *sub judice,* the defendant intends to murder one victim and instead kills an unintended victim. *Here, transferred intent applies because there is a death and the doctrine is necessary to impose criminal liability for the murder of the unintended victim in addition to the attempted murder of the intended victim.* In *Ford,* this Court asserted that the doctrine is used when the defendant fails to commit the crime intended upon the targeted victim and completes it upon another. Thus, the doctrine should be applied to the instant case.

*Id.* at 530, 671 A.2d 501 (internal citations and emphasis omitted) (emphasis added).

To summarize the evolution of transferred intent and its current application under Maryland law, there is no conflict among legal authorities that the principle applies when lethal force is directed toward an intended victim, but misses its target and kills an unintended victim.[6] Likewise, it is settled Maryland law that there can be no transferred intent when the unintended victim is neither killed nor injured.[7]

More problematic was the so-called "intermediate position," where the unintended victim is actually hit though not killed. Judge Moylan, writing for this Court in *Harvey v. State,* 111

---

6. *Gladden v. State, supra; Evans v. State,* 28 Md.App. 640, 687–88, 349 A.2d 300 (1975).

7. *See Harrod v. State,* 65 Md.App. 128, 137, 499 A.2d 959 (1985)(holding that where thrown hammer missed intended victim and narrowly missed infant in a crib, "[t]he absurd result [of extending the doctrine] would be to make one criminally culpable for each unintended victim who, although in harm's way, was in fact not harmed by a missed attempt towards a specific person. We refuse, therefore, to extend the doctrine of transferred intent to cases where a third person is not in fact harmed.")

Md.App. 401, 425–28, 681 A.2d 628 (1996), analyzed the fact pattern under review in the case at hand:

It is the intermediate situation—when the unintended victim is actually hit though not killed—that has divided the Court of Appeals. In *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988), the two defendants fired four or five shots at a fleeing Marvin Brown, indisputably intending to kill him. They missed Brown, however, and one of the errant shots hit Juan Kent, an innocent bystander. Kent survived his wound, but suffered paralysis on one side of his body and brain damage that left him unable to walk or to speak. The defendants were convicted of two separate counts of attempted first-degree murder, one with respect to the intended victim, Marvin Brown, and the other with respect to the unintended victim, Juan Kent. 313 Md. at 601–02, 546 A.2d 1041.

We observed in *Harvey* that the *Wilson* Court, under traditional attempt law, had no difficulty affirming the conviction for the attempted first-degree murder of Marvin Brown. We then pointed out that the Court affirmed the conviction in the case of Juan Kent on the ground that the actual battery inflicted on him was the *actus reus* and that the murderous *mens rea* intended for Marvin Brown had transferred to Juan Kent. The *Wilson* Court, we said, held that "the doctrine of transferred intent applies to the crime of attempted murder and . . . the *mens rea* or specific intent of a defendant as to his intended victim will carry over and determine his culpability when such criminal conduct causes injury to an unintended victim." *Id.* at 425, 681 A.2d 628. We pointed out that, in earlier *dicta* in the same opinion, the Court of Appeals had also concluded that its application of the transferred intent doctrine would apply, not only to attempted murder, but also to the inchoate crime of assault with intent to murder. We then chronicled the Court's later view of *Wilson:*

Five years after *Wilson,* a four-judge majority in *Ford v. State,* 330 Md. 682, 625 A.2d 984 (1993), in *dicta* to be sure but in extensive and well-considered *dicta,* effected a massive correction of course. It reasoned that the *Wilson*

rationale was incorrect and that the transferred intent doctrine should not have been applied by *Wilson* to any of the inchoate homicides such as attempted murder or attempted voluntary manslaughter or assault with intent to murder. Judge Chasanow argued that the transferred intent doctrine is appropriate for a consummated homicide perpetrated on an unintended victim but *has no similar applicability in the case of inchoate homicides.* The *Ford* majority stated flatly, 330 Md. at 714, 625 A.2d 984:

> We believe *Wilson* should not have applied transferred intent to attempted murder.

(Footnote omitted). In *Poe v. State,* 341 Md. 523, 529, 671 A.2d 501 (1996), the Court of Appeals summarized its earlier statement in *Ford:*

> We stated in *Ford* that transferred intent does not apply to attempted murder. *Id.* (disapproving application of the doctrine of transferred intent to attempted murder in *State v. Wilson,* 313 Md. 600, 546 A.2d 1041 (1988))....
> [T]he doctrine of transferred intent does not apply to attempted murder when there is no death.

*Poe* made it clear, 341 Md. at 530, 671 A.2d 501, that when the unintended victim is not killed, the transferred intent doctrine will not apply:

> In *Ford,* we made clear that *if a defendant intends to kill a specific victim and instead wounds an unintended victim without killing either, the defendant can be convicted only of the attempted murder of the intended victim and transferred intent does not apply.* This is not true where, as in the case sub judice, the defendant intends to murder one victim and instead kills an unintended victim.

*Id.* at 426–27, 681 A.2d 628 (Emphasis added).

We did note, parenthetically, that Judges Rodowsky and Karwacki, in a concurring opinion, had taken "strong exception to the effort to repudiate *Wilson.*" *Id.* at 427, 681 A.2d 628.

Citing *Harvey,* in *Harrison v. State,* 382 Md. 477, 508, 855 A.2d 1220 (2004), the Court of Appeals reaffirmed the principle that transferred intent does not apply where the unintended victim is injured, but not killed:

> The most compelling reason why we reject the doctrine of transferred intent as applied to crimes of attempt is that it is not necessary to make "a whole crime out of two halves by joining the intent as to one victim with the harm caused to another victim," the purpose for which it was conceived. *Ford,* 330 Md. at 712, 625 A.2d at 998. When the unintended victim has not suffered a fatal injury, the defendant already has committed a completed crime against the intended victim, and the seriousness of that crime is as great as if the intent were transferred to the unintended victim.

> Further, although not in this case, a defendant may be convicted of a crime against an unintended victim with the use of "concurrent intent" and without the use of "transferred intent." Such a defendant also may be convicted of criminal battery, and as Judge Moylan suggested in *Harvey v. State,* 111 Md.App. 401, 430, 681 A.2d 628, 643 (1996), "the crime of reckless endangerment is also available to pick up much of the slack and to make resort to the transferred intent doctrine less compelling." There is little, if any, utility in extending the doctrine of "transferred intent" to inchoate crimes such as attempted murder.

Most recently, the issue was revisited in *State v. Brady,* 393 Md. 502, 522, 903 A.2d 870 (2006), in which the Court of Appeals dismissed the State's argument that the discussion *in Ford* of the application of transferred intent to inchoate offenses is mere *dictum,* holding that the Court had "transformed that *dictum* into precedent when it decided *Poe*" and that "*Poe* made clear, 341 Md. at 530, 671 A.2d 501, that when the unintended victim is not killed, the transferred intent doctrine will not apply." (Internal quotations omitted).

The State seeks solace in what it perceives to be a substantive change from the former "statutory scheme," Article 27, § 386 to the "new statutory scheme," Md.Code Ann., Crim.

Law, § 3–202 (2006), in its attempt to salvage appellant's conviction. The State acknowledges that, in *Brady, supra, Ford, supra,* and *Williams v. State,* 117 Md.App. 55, 699 A.2d 473 (1997), this Court and the Court of Appeals "have held that transferred intent does not apply to inchoate crimes such as attempted murder or assault with intent to maim or disable." The State nevertheless argues that it should apply under § 3–202, noting: "Neither this court nor the Court of Appeals, however, has commented upon the applicability of the transferred intent doctrine to the revamped assault and battery statutory scheme, specifically, first-degree assault."

The State contends that "[t]he crime of first-degree assault, as codified by Criminal Law § 3–202, is different from inchoate homicide charges in that it expressly encompasses both the inchoate and completed act of intentionally harming another." Citing the statute, the State posits: "Criminal Law § 3–202 states, in pertinent part, 'A person may not intentionally cause *or* attempt to cause serious physical injury to another. There is no separate crime of attempted first-degree assault.' " (Emphasis added by the State). The State concludes, "Unlike cases involving attempted murder, where the perpetrator's intent toward the intended victim was unfulfilled with respect to the unintended victim, here Pettigrew's intent to cause serious injury was realized—his crime was not inchoate, but complete." Finally, the State, while making the valiant attempt to bring the facts of the instant case within the doctrine of transferred intent, with admirable candor, seems to make a concession when it recognizes that *Harvey* observes that "many of the doctrines unique to homicide, including transferred intent, 'do not travel well to other criminal climes' " when finding transferred intent inapplicable to assault with intent to murder."

The goal, urges the State, in applying the transferred intent doctrine is "to ensure that Pettigrew's *mens rea* with respect to his intended victim can be paired with the *actus reus* that profoundly affected Juarez, the unintended victim." Dispositive of the State's position and fatal to its ultimate rationale for application of the doctrine to § 3–202 is the very passage

from *Harvey* cited by the State, which we set forth more fully here:

> At a very fundamental level, there is an argument, based on internal consistency, against using the transferred intent doctrine in cases of inchoate homicide. We are concerned, after all, with a single crime-assault with intent to murder (or its common law analogue of attempted murder). It would be randomly haphazard to say with respect to that single crime that the transferred intent doctrine sometimes applies and sometimes does not. If transferred intent will not be used (as it is not) to elevate a simple assault into an assault with intent to murder when the victim is not touched, it makes no sense to say that precisely the same crime will be elevated into an assault with intent to murder when the victim is touched. That would be to make a distinction, within the single crime of assault with intent to murder, between those instances when the assault is of the attempted-battery variety (no touching) and those instances when the assault is of the actual-battery variety (touching). Guilt of assault with intent to murder should not rise or fall on the immaterial happenstance of whether the victim is touched. *The problem, after all, is one of mens rea and not of actus reus.*

*Harvey,* 111 Md.App. at 431, 681 A.2d 628 (emphasis added).

Initially, the flaw in the State's reasoning is that it seeks to "pair" the *actus reus* with the *mens rea.* As *Harvey* and the other decisions cited herein make clear, notwithstanding the debilitating and permanent injury suffered by Juarez, it is the *mens rea* which is determinative of whether transferred intent should be applied in the appropriate case.

Further explicating the centrality of *mens rea* in a determination of why transferred intent is inapplicable to inchoate crimes, *Harvey* continues:

> In *Ford v. State,* 330 Md. 682, 715, 625 A.2d 984 (1993), Judge Chasanow noted that in cases involving the inchoate criminal homicides, the random factor of whether or not a physical injury occurred is immaterial:

A related reason why transferred intent cannot properly apply to attempted murder derives from the fact that the crime of attempted murder requires no physical injury to the victim. Although in *Wilson* the bystander was in fact injured, injury is not an essential element of attempted murder.

There is one further argument based on logical inconsistency. If an assault with intent to murder misses its target and hits an unintended victim and the aggravating *mens rea* were then to be "transferred" so as to transform the otherwise simple battery of the unintended victim into a constructive assault with intent to murder, what are the limits of such logic? Suppose the assaultive force that misfired had instead been unleashed with the intent to rob the targeted victim; would the otherwise simple battery of the unintended victim thereby become a constructive assault with intent to rob? Suppose the assaultive force that misfired had been with the intent to rape the targeted victim; would the otherwise simple battery of the unintended victim thereby become a constructive assault with intent to rape? Could it be an assault with intent to rape, moreover, even if the unintended victim were a man? Why should one aggravating *mens rea* be transferable but others not? The use of an acknowledged fiction to manipulate specific intent, although necessary to establish guilt in the context of consummated criminal homicide, would degenerate into a carnival in the very different context of inchoate criminal homicide. There is, moreover, no reason to push the fiction beyond the limits of its necessary utility.

*Id.* at 431–32, 681 A.2d 628 (emphasis omitted).

Summarizing all of the above reasons for the more restrictive application of transferred intent, the *Harvey* Court concluded:

Consummated criminal homicide is, in the last analysis, *sui generis. Many of its complexities, such as the transferred intent doctrine, simply do not travel well to other criminal climes.* There is, moreover, no reason of necessity for making the transferred intent doctrine travel to climes *other*

*than that of actual, consummated criminal homicides.* For the rest, the actuality of the real *mens rea* properly combined with its precisely related *actus reus* is enough to establish guilt at the appropriate level without any necessary resort to an intention-shifting legal fiction. The inchoate criminal homicides are in no need of such a device. *Id.* at 432, 681 A.2d 628 (emphasis added).

The State's argument, in essence, is that, under the language of § 3–202, the proscription that one "may not intentionally cause *or* attempt to cause serious physical injury to another" distinguishes it from inchoate homicide charges, there being no separate crime of attempted first-degree assault. The State does not assert that first-degree assault is no longer an inchoate crime, but rather that it is different from inchoate homicide charges. While there is no separate crime of attempted first-degree assault, an attempt is expressly stated as an alternative, under § 3–202, to actually causing serious physical injury to another.

The Court of Appeals, in *Robinson v. State,* 353 Md. 683, 728 A.2d 698 (1999) explained that the 1996 assault statutes, unlike the statutes which simply established penalties for the categories of common-law felonious homicides, subsumed and combined all statutory offenses of assault then existent as well as all common law forms of assault and battery into a single and comprehensive statutory scheme. *Id.* at 695, 728 A.2d 698. Holding that the 1996 assault statutes represent the entire subject matter of assault crimes, the Court concluded "that the new assault statutes, effective October 1, 1996, abrogated the common law offenses of assault and battery." *Id.* Significantly, under Md.Code Ann., Criminal Law, § 3–201(b), "Definitions," "Assault" is defined as "the crimes of assault, battery, and assault and battery, *which retain their judicially determined meanings."* (Emphasis added). Thus, although § 3–201 has subsumed and combined all statutory and common law forms of assault and battery into a single and comprehensive statutory scheme, the judicially determined meanings" remain unchanged; it is only a more precise delineation of culpability based on intended harm, as gleaned from

acts, the natural consequences of which are fatal or likely to cause serious or permanent injury.

More importantly, the above passage from *Harvey* makes luminously clear that the doctrine of transferred intent is inapplicable to inchoate offenses and, specifically, to instances where the unintended victim is injured, but not killed. Apparently sensing that the doctrine of transferred intent may not carry the day, the State, alternatively, asserts that appellant's first-degree assault conviction is supported by the theory of concurrent intent.

### CONCURRENT INTENT

■ Appellant initially responds to the State's interposition of the doctrine of concurrent intent as an issue on appeal, protesting, "Recognizing that transferred intent is inapplicable here, the State, for the first time, argues that the theory of concurrent intent establishes the requisite specific intent to cause serious physical injury to Mrs. Juarez. Reasoning that "[appellant] should not be rewarded because his aim was bad," the prosecution doggedly argued to the court that "[appellant] should not be given the benefit of not having that doctrine of transferred intent apply in this case, and this is specifically, this is the prototypical, I would say, for applying a transferred intent doctrine."

The State further maintained, "The purpose of the doctrine is basically to bridge two halves of the crime together . . . and the transferred intent doctrine bridges the two together so you have a completed crime." In an attempt to distinguish *Harrison,* the prosecutor told the court, "But in this case, we're not talking about incoherent [sic] defense, we're talking about a victim that suffered an injury of that very type that [appellant] intended upon his intended victim.

Of greater significance regarding whether concurrent intent was presented at the trial level, the assistant State's attorney, after reminding the jury that the judge had instructed it "under the doctrine of transferred intent," then reasoned that "[the doctrine] makes sense, [a]nd the reason is, the purpose

of that doctrine is, so that people who have formed a criminal intent and taking action to bring that criminal intent into fruition, they should not benefit from having bad aim or just being unlucky."

From the foregoing, not only was the theory of the prosecution's case based on the doctrine of transferred intent, the assistant State's attorney was persistent and, in support of his argument, attempted to distinguish previous decisions, *e.g. Harrison*, in which the doctrine had been found to be inapplicable. The jury was told in excruciating detail, conceptually, the essence of transferred intent. The State argues that the concept was before the jury, just not that it had been denominated as such. To the contrary, the State labored to convey to the jury that the rationale for its verdict of guilty of first-degree assault should be transferred intent.

Evidence intended to demonstrate the proximity of Juarez to the site of the melee had been offered, and the evidence was irrefutable that appellant had indiscriminately hurled missiles in an erratic and frantic manner. And, although the Court, in its analysis, made reference to the concept of "zone of harm," in noting that transferred intent didn't apply in *Harrison*, and the Court further concluded, "Clearly in Applebee's there was a zone of harm created by [appellant's] actions, the doctrine of concurrent intent was never mentioned.[8] Because it was never mentioned, appellant's counsel was never afforded the opportunity to argue that the doctrine of concurrent intent did not apply, but, more importantly, the jury was never instructed as to the appropriate analysis in its deliberations to determine whether concurrent intent applied. Rather than conceptualizing that the intent "followed the bullet" under a transferred intent analysis, comprehending the concept of "zone of harm" was required for the jury to apply the concept of concurrent intent. *See Harrison, supra.*[9]

---

8. It appears that the court, in considering only transferred intent, rather than concurring intent was merely responding to the theory of the State's case, as framed by the prosecutor.

9. Concurrent intent is succinctly explicated in *Harrison:*

That the prosecution did not present—and have the concept explicitly delineated—to the jury, is dispositive of this issue.

The holding of the Court of Appeals in *Garrett v. State*, 394 Md. 217, 226-27, 905 A.2d 334 (2006), is eerily on point:

The application of *Brady* to the present case is clear, and we, therefore, reverse the Court of Special Appeals's judgment with respect to Garrett's two convictions of attempted first-degree murder because those convictions should have been reviewed under a plain error analysis rather than affirmed under the legal theory of concurrent intent, *a theory that was interjected for the first time on appeal.* By utilizing plain error analysis, the panel in the present case should have reversed Garrett's convictions of attempted first-degree murder after the jury had been instructed on transferred intent, for as we stated in *Brady*, "[a]s articulated in *Poe*, if a defendant intends to kill a specific victim and instead wounds an unintended victim without killing either, the defendant can be convicted only of the attempted murder of the intended victim and transferred intent does not apply."

The State relies on *Cox v. State*, 397 Md. 200, 212, 916 A.2d 311 (2007), in arguing that an oblique reference to concurrent intent, without specifically arguing the application of the doctrine, should provide the basis for upholding the conviction for first-degree assault. The State's reliance on *Cox* is misplaced. In that case, the Court of Appeals considered Petitioner's argument that, because the State failed to argue to the motions court that the arrest constituted an intervening circumstance, the State failed to preserve that argument for appellate review. The Court ultimately held

---

In concurrent-intent analyses, courts focus on the "means employed to commit the crime" and the "zone of harm around [the] victim." *Ford*, 330 Md. at 717, 625 A.2d 984. The essential questions, therefore, become (1) whether a fact-finder could infer that the defendant intentionally escalated his mode of attack to such an extent that he or she created a "zone of harm," and (2) whether the facts establish that the actual victim resided in that zone when he or she was injured. *Id.* at 495, 855 A.2d 1220.

that the issue as to the legality of the arrest was plainly preserved, for appellate review, even though the State did not use the "magic words," "dissipate" or "attenuate," to explain why "the initial encounter [did] not matter"-because of the intervening event, *i.e.*, the discovery of an outstanding warrant and an arrest pursuant thereto. Thus, we are satisfied that the issue was put forth at the trial level and the contention that there was an intervening circumstance is properly before us.

*Id.* at 212, 916 A.2d 311 (footnote omitted).

The holding in *Cox* provides us with no guidance regarding the preservation issue before us in this case. What is strikingly different is that, in *Cox*, a legal issue was presented to one learned in the law, a motions judge, who we presume comprehended the issue advanced by the State, *i.e.*, the dissipation or attenuation, *vel non*, of the effect of the initial encounter with the police. Here, by contrast, jurors, unlearned in the law, who were probably sorely tested in grasping the concept of transferred intent, are expected to have incorporated into the deliberative process the concept of concurrent intent, without it having been properly presented to them. Patently, appellant's conviction for first degree assault was based on the State's theory of transferred intent. The State may not now seek to salvage the conviction on a theory not presented to the jury.

## III

### MERGER

In light of our decision, *supra*, that the conviction for first-degree assault must be reversed, no longer do two convictions based on offenses containing the same elements and growing out of the same facts remain. Because we are not persuaded that, under the circumstances of the case at hand, the infirmity of the proceedings regarding the first-degree assault conviction in any way affected the jury's verdict for reckless endangerment, we shall not disturb the judgment of conviction for reckless endangerment.

**JUDGMENT OF CONVICTION FOR FIRST DEGREE ASSAULT REVERSED; CONVICTIONS FOR REMAINING OFFENSES AFFIRMED; COSTS TO BE PAID TWO THIRDS BY APPELLANT AND ONE THIRD BY BALTIMORE COUNTY.**