73 A.3d 1136

Kevin E. JONES

v.

STATE of Maryland.

No. 660, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Aug. 30, 2013.

Brian L. Zavin (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: GRAEFF, JAMES A. KENNEY, III (Retired, Specially Assigned), RAYMOND G. THIEME, JR. (Retired, Specially Assigned), JJ.

GRAEFF, J.

Appellant, Kevin E. Jones, was charged in the Circuit Court for Somerset County with multiple counts each of attempted first and second degree murder, first and second degree assault, and reckless endangerment, as well as one count of wearing, carrying, and transporting a handgun and use of a handgun in the commission of a felony. A jury convicted appellant of two counts of second degree assault, of Ms. Christine Johnson and Ms. Nikita Tindley, and three counts of reckless endangerment, of Ms. Johnson, Ms. Tindley, and Ms. Johnson's seven-year-old grandson, Devonte Bowen. The

court sentenced appellant to ten years for the assault conviction against Ms. Johnson, ten years, consecutive, for the assault conviction against Ms. Tindley, and five years, suspended, for the conviction of reckless endangerment of Devonte Bowen.[1]

On appeal, appellant presents the following question for our review:

Was the evidence sufficient to support appellant's conviction for second degree assault of Christine Johnson?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On the evening of September 17, 2010, Ms. Tindley was in an apartment in Somerset County with, among others, her mother, Ms. Johnson, and her nephew, Devonte Bowen.[2] After midnight, there was a knock on the apartment door. Ms. Tindley opened the door and saw appellant, whom she had met earlier that evening, accompanied by two other males. She explained what happened next as follows:

He was like where the Niggers at[?] And I was like what Niggers? And he went down to his pants. So I closed the door. And my mom was on her way to the door I said, mom, don't go to the door they got a gun. And by th[at] time then shots was fired. So everybody was getting down in the house and stuff. And I called the police since I was the one that identify him.

At the time the shots were fired, Devonte was on the computer in the living room.

Ms. Tindley was terrified by the gun shots. She did not understand why appellant would shoot through the door when she had been standing there seconds earlier. Ms. Tindley heard three gunshots.

---

1. The court merged for sentencing purposes the other convictions for reckless endangerment.

2. Also present in the apartment that evening was the father of Ms. Tindley's baby, as well as two of his friends.

Ms. Johnson testified that, on the night of the shooting, she heard a knock on the apartment door. Ms. Tindley answered the door, and Ms. Johnson heard a voice ask: "[W]here them Niggers at[?]" Ms. Tindley said: "[N]obody here," and she closed the door. Ms. Johnson began to approach the front door, but she ran into the bathroom after Ms. Tindley said: "[M]om, don't go to the door they got a gun." Ms. Johnson told Devonte to get down and go to her room, and then three shots came through the door. Ms. Johnson was scared. Ms. Tindley called the police, and officers arrived at the scene within five minutes.

Officer Dave Adams, a member of the Princess Anne Police Department, was dispatched to the apartment at approximately 1:13 a.m. on September 18, 2010. Officer Adams met Ms. Johnson, her grandson, and Ms. Tindley at the scene. He recovered bullets from the center of the front door, the living room wall, and the wall of the back bedroom, where a bullet came to rest after passing through a child's playpen.

While conducting witness interviews in the apartment complex parking lot, Officer Adams observed a blue, compact, four-door car enter the lot. After the vehicle was parked several doors down from the crime scene, several individuals, including appellant, exited the vehicle. Ms. Tindley identified appellant as the individual who had fired a weapon through her apartment door, and Officer Adams took appellant into investigative detention.

Byron Johnson testified that he and Demetrius Rogers picked up appellant and Andre Schoolfield on the night of September 17, 2010. Appellant advised that, earlier that day, he had been involved in an altercation with two boys. They drove to Wink Lane Apartments, and Mr. Johnson heard a gun "getting loaded, heard the chamber set," and he saw appellant with a gun "through [his] peripheral." When they arrived at the apartments, appellant and Mr. Schoolfield exited the car.

From the front passenger seat of the vehicle, Mr. Johnson observed appellant and Mr. Schoolfield walk "to some lady's

door." Mr. Rogers got out of the car as appellant knocked on the door. Mr. Rogers "didn't go all the way to the door," but rather, "[h]e stopped as soon as the lady answered the door." At that point, the following occurred:

Heard [appellant] state where the two Niggers at. After that I couldn't hear what the lady had said all I heard was yelling. That's when [Mr.] Rogers turned around [and] came back to the car say he didn't want nothing to do with it. That's why I stayed in the car because I didn't want nothing to do with it.

Then after that I just seen the lady slam the door. And then we just heard three gunshots.

After the gunshots were fired, appellant and Mr. Schoolfield returned to the car, and the men left the scene. Appellant stated "that he had shot a gun out there twice earlier that evening," explaining that he "was going to kill them[,] the two boys . . . he was trying to get." Appellant made a phone call, and a person in a blue sports car picked him up.

On cross-examination, Mr. Johnson admitted that he had been charged with attempted murder as a result of the events that evening. He denied, however, playing any role in the shooting. Mr. Johnson acknowledged that he had entered a plea of guilty to the charge of conspiracy to commit first degree assault, and the State had agreed to recommend a sentence of less than 18 months.

**DISCUSSION**

Appellant challenges only his conviction for second degree assault relating to Ms. Johnson. In that regard, he contends that the evidence was insufficient to support his conviction, asserting that "the State presented no proof that [appellant] was aware of Ms. Johnson's presence in the apartment at the time he fired the alleged shots," and therefore, there was no proof that he had the specific intent to place her in apprehension of an imminent battery.[3]

---

**3.** The evidence clearly was sufficient to show that appellant knew Ms. Tindley was in the apartment and therefore, to support the conviction

The State responds in two ways. Initially, it contends that appellant failed to preserve this issue for review because he did not make this argument below. In any event, the State argues, the claim is without merit. It asserts:

[T]he evidence was sufficient to prove: 1) [appellant] had a specific intent to frighten the occupants or residents of the apartment, and Ms. Johnson was an occupant of the apartment; 2) [appellant] knew or believed that there were people in the apartment and he had a specific intent to frighten the people in the apartment; and 3) [appellant] heard Ms. Tindley warn Ms. Johnson and/or heard Ms. Johnson warn her grandson, and thus [appellant] knew Ms. Johnson was present in the apartment when he fired three shots into the closed door.

Alternatively, the State argues that "the doctrine of transferred intent is arguably applicable, and pursuant to that doctrine, [appellant's] specific intent as to Ms. Tindley and/or 'the two boys' was transferred to Ms. Johnson." We will dispose of this alternative contention quickly. Initially, the doctrine of transferred intent, which was not argued below, clearly is limited to murder, and it does not apply to the crime of assault. *See Pettigrew v. State,* 175 Md.App. 296, 314–15, 927 A.2d 69 (2007) (there is " 'no reason . . . for making the transferred intent doctrine travel to [crimes] *other than that of actual, consummated criminal homicides* ' ") (quoting *Harvey v. State,* 111 Md.App. 401, 432, 681 A.2d 628 (1996)). Moreover, transferred intent applies to "bad aim cases," where a defendant shoots at X, misses, and hits Y instead, not to cases of "mistaken identity," where a defendant shoots at X and hits him, although he mistakenly believes X is Y. *See Wieland v. State,* 101 Md.App. 1, 45–46, 643 A.2d 446 (1994). Here, as discussed, *infra,* the jury could infer that appellant

of assault against him. Moreover, this Court's opinion in *Pryor v. State,* 195 Md.App. 311, 333, 6 A.3d 343 (2010), controls with respect to the reckless endangerment convictions. In that case, where the defendant set fire to a house, this Court held that the defendant need not be aware that the victim actually was home at the time to be guilty of reckless endangerment.

shot into the home at Ms. Johnson, even though he mistakenly believed that he was shooting at the boys with whom he earlier had argued. Thus, for several reasons, the doctrine of transferred intent is not even arguably applicable here.

 Thus, we turn to the contention of specific intent as it relates to Ms. Johnson. Initially, we address the State's preservation argument. As the State notes, pursuant to Md. Rule 4–324(a), when moving for judgment of acquittal, the defendant "shall state with particularity all reasons why the motion should be granted." Grounds that are not raised in support of a motion for judgment of acquittal at trial may not be raised on appeal. *Graham v. State*, 325 Md. 398, 417, 601 A.2d 131 (1992). *Accord Starr v. State*, 405 Md. 293, 302, 951 A.2d 87 (2008).

Here, in the motion for judgment of acquittal, defense counsel argued multiple times, albeit relating to charges other than second degree assault, that the State had failed to introduce evidence that appellant knew Ms. Johnson and her grandson were inside the apartment when appellant fired the gun. The trial court agreed with respect to the murder charges, expressing concern that it was "not even sure [appellant] knew that there was anybody else in the apartment."

With regard to the charges of assault, defense counsel argued:

Your Honor, with regard—and, again, *it's pretty much all the same argument* because the charges are, you know, while they are different underlying offenses, first degree murder, second degree murder, assault and basically shooting a gun at someone and the State essentially is in pretty much the same position of the charge of did commit a first degree assault on Christine Johnson, did commit a first degree on Devonte Bowen. *It's the same thing. He didn't know they were there.* At most this is reckless endangerment. If you fired a gun at someone with the intent to hurt them or scare them, yeah, that's one thing. But when you

fire a gun and you don't know anyone is there that is not assault. Assault must be just as intentional.

(Emphasis added).

Under these circumstances, appellant's contention on appeal, that there was insufficient evidence of intent because the evidence did not show that appellant knew Ms. Johnson was inside the apartment, is preserved for review.[4] Thus, we turn to the merits of the argument.

We review "an issue regarding the sufficiency of the evidence in a criminal trial by determining 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Titus v. State*, 423 Md. 548, 557, 32 A.3d 44 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "We do not re-weigh the evidence, but 'we do determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.' " *State v. Smith*, 374 Md. 527, 534, 823 A.2d 664 (2003) (quoting *White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001)). "We 'must give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether [the appellate court] would have chosen a different reasonable inference.' " *Cox v. State*, 421 Md. 630, 657, 28 A.3d 687 (2011) (quoting *Bible v. State*, 411 Md. 138, 156, 982 A.2d 348 (2009)).

Maryland Code (2009 Supp.) § 3–203 of the Criminal Law Article ("C.L.") prohibits a person from committing an assault. An "assault" includes "the offenses of assault, battery, and assault and battery, which terms retain their judi-

---

4. To be sure, when the court specifically asked about second degree assault, defense counsel focused on the lack of evidence that Devonte was frightened, which the State conceded. The record reflects, however, that appellant clearly was arguing that the motion for judgment of acquittal on the assault convictions should be granted because appellant "didn't know [Ms. Johnson was] there."

cially determined meanings." *Snyder v. State,* 210 Md.App. 370, 381, 63 A.3d 128 (2013). This Court recognized in *Lamb v. State,* 93 Md.App. 422, 441, 613 A.2d 402 (1992), that " '[t]he common law crime of assault encompasses two definitions: (1) an attempt to commit a battery or (2) an unlawful intentional act which places another in reasonable apprehension of receiving an immediate battery.' " (quoting *Harrod v. State,* 65 Md.App. 128, 131, 499 A.2d 959 (1985)), *cert. denied,* 329 Md. 110, 617 A.2d 1055 (1993).

■ Here, the State's theory, and the theory on which the court instructed the jury, was that appellant committed the intent to frighten form of assault. As this Court recently explained, the intent to frighten variety of assault requires: (1) "that the defendant commit an act with the intent to place another in fear of immediate physical harm"; (2) that "the defendant had the apparent ability, at that time, to bring about the physical harm"; and (3) that the victim "be aware of the impending battery." *Snyder,* 210 Md.App. at 382, 63 A.3d 128.

Appellant does not challenge the second two elements; he takes issue only with the first element, "the intent to place another in fear of immediate physical harm." He notes, correctly, that this is a specific intent crime. In *Wieland v. State,* 101 Md.App. 1, 38, 643 A.2d 446 (1994), this Court explained:

> In terms of intent, the defendant must possess the general intent to make the threatening gesture (the raising of the fist, the pointing of the gun). The threatening gesture is the immediate act generally intended. In addition, however, there must be the specific intent for that immediate act to bring about a more remote consequence, to wit, the engendering of the apprehension or fear of imminent bodily harm in the mind of the apparent victim. That second mental element is quintessentially a specific intent.

*Accord Hickman v. State,* 193 Md.App. 238, 251, 996 A.2d 974 (2010).

 In determining a defendant's intent, the trier of fact can infer the requisite intent "from surrounding circumstances such as 'the accused's acts, conduct and words.'" *Smallwood v. State*, 343 Md. 97, 104, 680 A.2d 512 (1996) (quoting *State v. Raines*, 326 Md. 582, 591, 606 A.2d 265 (1992)). A jury may "infer that 'one intends the natural and probable consequences of his act.'" *Ford v. State*, 330 Md. 682, 704, 625 A.2d 984 (1993) (quoting *Davis v. State*, 204 Md. 44, 51, 102 A.2d 816 (1954)), *superseded by statute.*[5] *Accord Chilcoat v. State*, 155 Md.App. 394, 403, 843 A.2d 240, *cert. denied*, 381 Md. 675, 851 A.2d 594 (2004).

 The question in this case is whether the specific intent to frighten must be directed to a particular person, as opposed to just another person in general. Appellant argues that the evidence must show an intent to frighten the person actually frightened, and because there was no evidence that he was aware of Ms. Johnson's presence in the house, the evidence was insufficient to support his conviction. In other words, he asserts that he could not have specifically intended to create a reasonable apprehension of an imminent battery in a person "of whose presence he was totally unaware."

We note that neither party identified any Maryland case addressing the precise issue presented here. We find instructive, however, the Court of Appeals' decision in *Ford*, 330 Md. at 682, 625 A.2d 984, as well as cases from other jurisdictions.

In *Ford*, the defendant was convicted of, among other counts, assault with intent to disable eleven drivers and four passengers, based on his actions in throwing landscaping rocks at vehicles driving on the Capital Beltway. *Id.* at 689, 702, 625 A.2d 984. The Court rejected Ford's argument that there was insufficient evidence of a specific intent to disable, stating that "[a] rational jury could have found that, when Ford threw

5. In 1996, the Maryland General Assembly enacted Art. 27 §§ 12, 12A and 12A-1, which abrogated the crimes and offenses of assault and battery. *Robinson v. State*, 353 Md. 683, 696, 728 A.2d 698 (1999). As indicated, however, the offenses retained their judicially determined meanings. *Id.* at 694, 728 A.2d 698.

rocks at the windshields of vehicles travelling at highway speed, he intended to permanently disable any and all occupants of the vehicles." *Id.* at 704, 625 A.2d 984. It further rejected Ford's argument that "there was insufficient evidence to support a finding that he knew there were passengers in the vehicles," and "it was impossible for him to have intended to maim or disable individuals whom he did not know were present." *Id.* at 705, 625 A.2d 984.

The Court did not specifically address whether Ford had to have specific knowledge that passengers were in the vehicles because it concluded that there was such evidence, i.e., the jury could infer that Ford was aware of the presence of "at least the four passengers whom it found were victims of assault with intent to disable." *Id.* For purposes of this case, however, we note that the evidence indicated that Ford knew that passengers in general were present; the evidence did not suggest that the defendant knew the identity of the passengers. The Court nonetheless found that there was sufficient evidence of a specific intent to disable the passengers, *id.* at 707, 625 A.2d 984, regardless of his lack of knowledge of their identities.

Accordingly, applying this analysis here, the evidence needed to show only that appellant believed that other occupants were in the apartment, not that Ms. Johnson, in particular, was there. There was such evidence in this case.

Initially, the jury could infer from the testimony that appellant went to the apartment intending to shoot at the "two boys" with whom he had fought earlier that day. The jury, therefore, could infer that, when appellant subsequently fired the gun, he did so with the intent to frighten them.

Moreover, there was testimony that, prior to appellant shooting, there was yelling by Ms. Tindley and Ms. Johnson inside the apartment. A reasonable jury could infer that this yelling put appellant on notice that there were individuals in the apartment other than Ms. Tindley. Accordingly, as in *Ford,* 330 Md. at 704, 625 A.2d 984, where the Court found that the jury reasonably could infer Ford's specific intent to

disable "any and all occupants" by throwing rocks at vehicles traveling at high speeds, the jury here reasonably could infer that, by firing three shots into the apartment door, appellant intended to place "any and all occupants" of the apartment, including Ms. Johnson, in fear of an imminent battery.

In any event, even if the evidence was not sufficient for a jury to infer that appellant was aware that there were occupants other than Ms. Tindley in the apartment, the evidence was sufficient to support the assault conviction of Ms. Johnson. We hold that, when a defendant fires shots into an occupied residence, the evidence is sufficient to support a conviction of the intent to frighten variety of assault with respect to each occupant who reasonably was frightened, regardless whether the shooter was aware of the presence of that occupant.

Other jurisdictions similarly have held. In *State v. Hough*, 585 N.W.2d 393, 395 (Minn.1998), the Minnesota Supreme Court addressed an analogous case, whether the evidence was sufficient to support six convictions of the intent to frighten variety of assault based on the defendant firing seven rifle shots into the home of his high school principal. At the time the shots were fired, the principal was at home with his wife and four sleeping children. *Id.* at 394. The defendant argued that, because he intended only to scare the principal, his convictions relating to the principal's wife and four children could not be sustained. *Id.* at 396. The court disagreed. Noting that the Minnesota statute defined the type of assault involved as " 'an act done with intent to cause fear in another of immediate bodily harm or death,' " *id.* at 395 (quoting Minn.Stat. (1996) § 609.02(10)(1)), the court upheld the six convictions, stating that, even if the children were unintended victims, "the assailant's knowledge of the presence of a particular victim is not essential to sustain a conviction under the statute." [6] *Id.* The court explained:

---

6. In Maryland, the statutory and incorporated judicial definition of second degree assault similarly defines assault as the intent to frighten "another." *See* Md.Code (2006 Supp.) § 3–201 of the Criminal Law

When an assailant fires numerous shots from a semiautomatic weapon into a home, it may be inferred that the assailant intends to cause fear of immediate bodily harm or death to those within the home. As the trial court noted, it was a natural and probable consequence that Hough's actions would endanger people other than [the principal]. Such intentional behavior is not excused simply because Hough claims he did not know others were present in the home or because others within the home were not immediately aware of the dangerous act.[7] Therefore, we reverse the decision of the court of appeals and affirm the trial court's conclusion that Hough is guilty of six counts of assault in the second degree, one count for each member of the Staska family.

*Id.* at 397.

Similarly, in *People v. Vang,* 87 Cal.App.4th 554, 104 Cal. Rptr.2d 704, 705, 710 (2001), defendants were convicted of eleven counts of attempted murder stemming from drive-by shootings at two residences. The defendants were members of a gang, and there was evidence that their respective targets at the two residences were believed by defendants to be associated with a rival gang. *Id.* at 707. The day the shootings took place, five occupants, including the intended target, were home at the first residence, and six occupants, including the intended target, were home at the second residence. *Id.* at 710. The defendants challenged their convictions for nine of the attempted murder counts, asserting that the evidence was insufficient to show that they possessed the

---

Article (defining assault as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings"); *and Snyder v. State,* 210 Md.App. 370, 382, 63 A.3d 128 (2013) (The intent to frighten variety of second degree assault "requires that the defendant commit an act with the intent to place *another* in fear of immediate physical harm.") (emphasis added).

7. This portion of the Minnesota Supreme Court's analysis, that a victim need not be aware of the defendant's dangerous act, is inapplicable here, as Maryland requires that the victim "be aware of the impending battery." *Snyder,* 210 Md.App. at 382, 63 A.3d 128.

requisite intent to kill anyone other than the two men they were targeting with the shootings. *Id.* at 710.

The California Court of Appeals disagreed, stating that "[t]he jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up." *Id.* The court explained that the defendants' inability to "see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." *Id.* at 711.

Applying the reasoning of these cases here, appellant's intentional act of firing multiple shots into a residence permitted the jury to infer an intent to frighten every occupant in the house, including Ms. Johnson. As in *Hough,* 585 N.W.2d at 397, appellant's intentional behavior is not excused simply because appellant claims that he did not know others were present in the home. The evidence was sufficient to support appellant's conviction for second degree assault of Ms. Johnson.

**JUDGMENTS OF THE CIRCUIT COURT FOR SOMERSET COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**